UNITED STATES *v.* SHOKAI (No. 2772)[1]

1. GETAS—WOODEN CLOGS—"FOOTWEAR"—"UPPERS"—SANDALS.

   Japanese footwear known as "getas," which are wooden clogs or soles, attached to the foot by fabric straps passing through perforations in them, are dutiable under paragraph 1405, Tariff Act of 1922, which provides for: "Boots, shoes, or other footwear, the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, or silk, or substitutes for any of the foregoing, whether or not the soles are composed of leather, wood, or other material." The straps are "uppers" within the meaning of the paragraph. By providing for "other footwear" Congress recognized that there was "footwear" which was neither "boots" nor "shoes."

1 T. D. 42033.

2. COMMERCIAL DESIGNATION—WITNESS'S QUALIFICATION.

A witness whose experience did not relate to the imported, or similar, articles was not qualified to testify as to commercial designation.

United States Court of Customs Appeals, February 24, 1927

APPEAL from Board of United States General Appraisers, G. A: 9082, T. D. 41304

[Reversed.]

*Charles D. Lawrence,* Assistant Attorney General (*Fred J. Carter,* special attorney, of counsel), for the United States.

*Frank L. Lawrence* (*Martin T. Baldwin* of counsel) for appellee.

[Oral argument October 5, 1926, by Mr. Carter]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, and HATFIELD, Associate Judges; BLAND, Associate Judge, participating in the decision by agreement of counsel

BLAND, Judge, delivered the opinion of the court:

Appellee imported at the port of Honolulu wooden clogs called getas, which are a kind of footwear worn by the Japanese in Japan, and to some extent in the United States. The trial court described the merchandise as follows:

* * * rectangular blocks of wood, rounded at the corners, flat on the upper side, but grooved and so cut on the under side to serve in a crude manner the purpose of a sole and heel. The clogs have three perforations through the surface, one on each side near the rear, and one in the center near the front. A thong or strap of certain fabric material runs along the upper surface from one of the holes on the rear side to the front hole in the center, and then back to the other rear hole. At the center perforation a piece of string covered with fabric material of the same kind as the strap projects through and slightly above the top surface of the clog from beneath, and is united to the strap at this point by having been looped and tied around it. Thus fastened, the strap on the upper side of the clog has the appearance of an inverted V, which V-shaped arrangement, according to the testimony, and as is quite obvious from the samples themselves, serves to catch the toes and so holds the clog on to the foot when in use.

They were assessed for duty at the rate of 35 per centum ad valorem under paragraph 1405 of the Tariff Act of 1922, which reads as follows:

PAR. 1405. Boots, shoes, or other footwear, the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, or silk, or substitutes for any of the foregoing, whether or not the soles are composed of leather, wood, or other material, 35 per centum ad valorem.

The importer protested the classification, making a number of claims, among which was the claim that they were dutiable as manufactures in chief value of wood, under paragraph 410.

It seems to be conceded by all parties concerned, and properly so, that the merchandise should fall within one of the two above referred to paragraphs. The Board of United States General Appraisers (now United States Customs Court) sustained the protest, holding the goods to be dutiable as manufactures in chief value of wood, from which action of the trial court the Government has appealed.

At the trial there were but two witnesses introduced. Kato Togasaki, called by the importer, testified that he was engaged in the Japanese importing business; that he was familiar with the Japanese customs in this country and Japan and that the merchandise was known as getas; that they are used as footwear and are worn by placing the great toe on one side of the thongs coming up through the front of the soles and the other toes on the opposite side of the thongs—the toes thus clamping around the thongs holding the clog in place. He further testified that they were worn with or without stockings. When stockings are worn the portion covering the great toe is divided or separated from the portion covering the other toes in the fashion of a mitten.

The importer's second witness, A. J. Baker, testified that he was a wholesale shoe jobber and had been for 30 years; that he had had manufacturing experience in a shoe-manufacturing establishment, and had been a salesman and department manager; that he knew how shoes were made, and had handled shoes and slippers; that he had learned what an upper of a shoe, slipper, or article of footwear was. He defined upper as—

a cover for the top of the foot extending from the sole over the instep either half way around, just so it is a covering for the upper part of the foot—

that the fabric of the imported articles did not come within his definition of the "uppers," but that it was only a strap to hold the wood part on the foot; that there never was a time when a thong, like the exhibit before him, would be considered an "upper," either from a manufacturing or a trade point of view. On cross-examination his testimony was as follows:

Q. If I should tell you that the definition of an upper is all of the shoe, or whatever it is, above the sole, would that be according to your understanding of an upper—everything above the sole?

General Appraiser WAITE. Everything above the sole?

Mr. FOLKS. Yes, sir.

A. Yes; but there are several ways of looking at it.

Q. Would it be according to your understanding?—A. Yes; it would.

Q. Would you refer to it as everything above the sole—that is, the way you would regard an upper?—A. No; not everything.

Q. If not, why not?—A. I wouldn't call straps an upper.

Q. You mean to say that a shoe that has merely straps has no upper at all?—A. If there is just the part covering the sole and straps attached to it, it has no upper, unless there would be enough straps on it to put them all the way around and so close together. You might call that an upper.

Q. Supposing just a toe piece, a strap?—A. That is merely a contrivance to hold the bottom on.

Q. Take ladies' slippers with just straps on the toe, say—they have no uppers at all?—A. Yes; they have uppers. You don't see any ladies' slippers with just straps without other things.

Q. What else do they have on?—A. Leather extending from the sole covering the part above the toes and the instep and around the heel and the straps are attached to that.

Q. The straps are attached to what?—A. To that upper.

Q. And they are part of the upper?—A. Yes; when they are that way.

Q. This fabric on here, the sample, is attached to the so-called sole of Exhibit 1, isn't it?—A. Yes; that is attached to the sole.

Q. And the upper is ordinarily what holds the shoe on the foot, isn't it, to keep it from slipping off?—A. It is true generally; yes.

Q. And this fabric on top keeps this from slipping off, doesn't it?—A. That is the purpose of it, entirely.

Q. Have you ever actually manufactured and sold shoes for your own account?—A. No.

Q. Did you ever make anything like collective Exhibit 1?—A. No.

Q. Never dealt in them?—A. No.

Upon this testimony the importer contends that commercial designation has been established, and that, commercially, in the United States, the fabric portion of these articles were not known as uppers.

The testimony does not establish commercial designation, chiefly for the reason that the experiences of the witness did not relate to the imported or similar articles. Neither does the evidence show that his definition of the word "upper" was definite, uniform, and general in trade and commerce on the date of importation. The rule has been frequently laid down, by this and other courts, guiding litigants in offering proof of commercial designation, and it may seem unnecessary to restate it here. Commercial designation is a fact to be proved in each case. The commercial meaning and the common meaning are presumed to be the same. If the commercial meaning is claimed to be different from the common meaning, and this is sought to be proved, in order that the commercial meaning may prevail over the common meaning, it must be shown that such commercial designation is definite, uniform, and general, and not partial, local, or personal. *Hedden* v. *Richard*, 149 U. S. 346, 348; *Maddock* v. *Magone*, 152 U. S. 368, 371; *Tower & Sons et al.* v. *United States*, 11 Ct. Cust. Appls. 157; *United States* v. *Snow's United States Sample Express Co. et al.*, 6 Ct. Cust. Appls. 477.

The meager and indefinite testimony of the single witness certainly does not satisfactorily prove that in trade and commerce throughout the United States, on the date of importation, the word "upper" had a meaning different from its common one, and that such commercial meaning, differing from the common meaning, was definite, uniform, and general.

Since the proof of commercial designation has failed, let us determine what weight we shall give the evidence as bearing upon the question of the common meaning of the term. We think the testimony of the witness may have some bearing on this question and may be given consideration in the decision of the case, but we do not regard it as controlling. The common understanding of a term may be shown by competent witnesses. *Robertson* v. *Salomon*, 130 U. S.

412; *United States* v. *Doragon Co. et al.*, 13 Ct. Cust. Appls. 182, T. D. 41051; *United States* v. *International Forwarding Co.*, 13 Ct. Cust. Appls. 190, T. D. 41052; *Austin, Nichols & Co.* v. *United States*, 4 Ct. Cust. Appls. 313. The common meaning of a word may also be determined from the dictionaries, lexicons, cyclopedias, and other authorities recognized and approved by those conversant with the meaning and use of the term. The word "upper" is defined as follows:

Funk & Wagnalls New Standard Dictionary:
Upper: 1. That part of a boot or shoe above the sole and welt.
The Century Dictionary and Cyclopedia:
Upper: The upper part of a shoe or boot, comprising the vamp and quarters.

In the Summary of Tariff Information, 1920, page 704, furnished for the use of Congress in the preparation of the tariff act, may be found the following:

The "upper" includes all of the shoe except the sole. The "vamp" is the part of the upper which comes next to the sole.

The word "sole" is defined as follows:

Funk & Wagnalls New Standard Dictionary:
Sole: 2. The bottom of a shoe, boot, sandal, or slipper; in a more restricted sense, the part of the bottom in front of the heel; also, the piece or pieces collectively that form the bottom.
Webster's New International Dictionary:
Sole: 3. The part of a shoe, boot, or the like, on which the sole of the foot rests in standing, walking, etc., or the material constituting it.
The Century Dictionary and Cyclopedia:
Sole: A slipper or sandal (consisting of a single sole fastened on by a strap across the instep), a kind of shoe.

The word "sandal" is defined as follows:

Funk & Wagnalls New Standard Dictionary:
Sandal: A kind of shoe consisting usually of a sole only, but sometimes with a shield for the heel and a cap for the toes, held to the foot by thongs, cords, etc.
Webster's New International Dictionary:
Sandal: A kind of shoe consisting of a sole strapped to the foot; a protection for the foot, covering its lower surface only. Sandals are much worn among orientals and are a part of the official dress of Roman Catholic bishops and abbots.
The New International Encyclopedia:
Shoe: The shoe in its simplest form was undoubtedly a sandal or sole with straps attached to it by means of which it might be fastened on to the foot. Such a shoe was designed simply to protect the bottom of the foot from the rough surface of the ground and from the extremes of temperature.

It will be seen that there is little difference, if any, between the importation and a sandal, and it may be called, properly, a sandal.

The Board of General Appraisers, while giving weight to the commercial designation, made no finding as to whether the straps of fabric were or were not uppers, but regarded the case of *United States* v. *Kahn & Co.*, 13 Ct. Cust. Appls. 57, T. D. 40881, as controlling of the issues and used the following language.

We quote from the language of that decision as follows:

In construing paragraph 1405 its apparent purpose must be borne in mind. Obviously, it is intended to embrace boots and shoes having uppers and soles of the various materials named in the paragraph and other footwear of a similar character. It is true that the uppers and soles of such footwear may be of wool as well as the other materials specifically mentioned. But it manifestly was not the intent to include therein all footwear. * * *

It is a reasonable assumption that Congress intended, by the language used in paragraph 1405, to include only such boots, shoes, and other footwear as were manufactured with uppers and soles, and that there should be on inspection some visible line of demarcation between such uppers and soles in each instance. Here the record shows there is no such distinction. We believe this is a proper case for the application of the doctrine of ejusdem generis and that paragraph 1405 should be construed as including boots and shoes, with uppers and soles made of the various materials named in the paragraph, and other footwear of like materials and of similar use and form.

There can be no question but that wooden clogs are footwear, inasmuch as they are worn or used on the feet, but, in our judgment, under the reasoning of the Court of Customs Appeals quoted above, they do not come within the provisions of paragraph 1405 for the reason that there is "no visible or definite line of demarcation" between the wooden soles and the projecting straps above that the Government contends are uppers. Hence the clogs are not ejusdem generis with the boots and shoes covered by said paragraph 1405, as construed by the court in the case cited supra.

We think the sole question in this case is: Are the straps or thongs of fabric "uppers" within the meaning of the term as used in paragraph 1405, *supra?* Under the foregoing definitions we think the common meaning of the term "uppers" is broad enough to include the straps and thongs in the merchandise at bar.

The board seems to have turned its decision on the proposition that this court had said in the *Kahn & Co.* case, *supra*, that footwear, as used in paragraph 1405, must consist of uppers with a clear and definite line of demarcation between the soles and the uppers, and held that, since there was no visible or definite line of demarcation between the wooden soles and the projecting straps above, they were not the kind of footwear covered by the paragraph. It is difficult for us to follow the reasoning of the board.

In the *Kahn* case, *supra*, the merchandise was infants' bootees of woolen yarn knitted. In a strict sense there was no sole or upper because there was no demarcation between the sole and upper, and both were composed of the same material. It could not be determined where the upper began, neither could it be determined what part of the article was upper and what part was sole.

In the case at bar it certainly can not be questioned that the wooden clog is the sole. The thongs or straps above the wood portion cover the foot and hold the sole to the foot. Certainly that portion of the fabric that extends above the sole, partially covering the foot and holding the sole in place, constitutes an upper within the common meaning of the term as above ascertained. The line of demarcation between the wood and the fabric is definite and plain. The sole is wood, the upper is cloth; the upper is above the sole. The *Kahn* case, *supra*, is not authority in this case.

398 14 COURT OF CUSTOMS APPEALS

It is urged that the V-shaped thong can not be regarded as an upper, since it does not serve, to any great extent, as a covering for the upper portion of the foot. We might inquire how much of the upper portion of the foot must be so covered in order that the covering may be termed an upper. In certain sandals and slippers in common use the portion above the sole affords but little cover for the foot. In other instances, half of the upper portion of the foot is covered. The uppers of some footwear entirely cover the upper portion of the foot. In defining "uppers," where shall the line be drawn? In most questions where a line or degree is prescribed the legislature determines it. In the instant case it has used the word "uppers" without definition or limitation. In the absence of a trade meaning differing from the common meaning we must ascertain the common understanding of the term.

In this case, as in *United States* v. *Kahn & Co.*, *supra*, it must be remembered that we are considering the meaning of a provision which pertains to *footwear* as well as to boots and shoes, and Congress, by the use of the word "footwear," must have recognized that there was a class of wear for the feet that might not be embraced in either of the words "boots" or "shoes."

We think the merchandise was properly classified for duty at 35 per centum ad valorem, under paragraph 1405 of the Tariff Act of 1922, and the judgment of the Board of General Appraisers (now United States Customs Court) is *reversed.*

### DISSENTING OPINION

SMITH and BARBER, Judges: We find ourselves unable to agree with the majority in this case. The importations are sandals and are footwear as stated in the majority opinion, but we do not think they are such footwear as is included in paragraph 1405 or that the thongs which hold the sandals to the foot are "uppers."

In *United States* v. *Kahn*, 13 Ct. Cust. Appls. 57, cited in the main opinion, we held by Presiding Judge Graham that paragraph 1405 included—

only such boots, shoes, and other footwear as were manufactured with uppers and soles, and that there should be on inspection some visible line of demarcation between such uppers and soles in each instance—

also that the rule of *ejusdem generis* was applicable, and that the paragraph—

should be construed as including boots and shoes, with uppers and soles made of the various materials named in the paragraph, and other footwear of like materials and of similar use and form.

Samples of the importation are before the court, and while the description thereof quoted in the majority opinion from that of the court below is substantially correct, it may be further amplified by saying

that the three holes in each clog are about an eighth of an inch in diameter, the two in the rear being each about an eighth of an inch distant from the nearest outer portion of the clog and 2 inches or more from the back end thereof. The front hole is 1 inch or more distant from the outer edge of the clog at any point. The exposed surface of the thongs on the top is about 5 inches in length, while the entire length of the clog is 8 inches or more. The thongs are prevented from pulling through the front holes by knots tied in the thongs on the underside, which knots exceed the diameter of the hole. These knots may be readily untied. The thong ends which pass through the rear holes are connected and tied together on the under part of the clogs by a small string or core which can be easily untied. The thongs are not otherwise fastened to the clogs, and they can, therefore, be easily removed with no injury to themselves or to the clog. The result of this arrangement is that, when the thongs are in position ready for wear, they do not approach within less than about an eighth of an inch from the outside periphery of the clog and there is nothing which in the least resembles the line of demarcation between the sole and upper referred to in the *Kahn* opinion and which always may be found in the ordinary boot or shoe. It is apparent that when the sandal is being worn the thongs do not reach back to the ankle and are relatively far below it.

Funk & Wagnalls define a shoe as—

a covering, usually of leather, for the foot reaching to a point just below the ankle.

And that is, in substance, we are clear, not only the common understanding of the meaning of the word, but also that given in the dictionaries. All lexicographers, in substance, define a shoe as consisting of a sole and an upper. The New International Encyclopedia defines an upper as consisting of—

Various parts according to the pattern by which it is cut, but in general the upper front part is the vamp, while the back part is called the "quarters." The upper may be sewed on the sole on the wrong side and turned, or on the right side usually by means of a welt.

A "welt" by the same authority is—

a narrow strip of leather sewed onto the lower edge of the upper, with the seam inside, and then turned and sewed flat onto the outer edge of the sole.

Funk & Wagnalls define a vamp as—

the piece of leather that forms the upper front part of a boot or shoe.

It is unnecessary to insert any of the numerous dictionary definitions as to what constitutes a shoe because they all accord with the common understanding that a shoe is a piece of footwear with a sole to which is *permanently attached* some sort of an upper, in doing which a welt and vamp are employed, the vamp in turn becoming a

part of the shoe upper which protects the foot and aids in holding it to the foot.

In the sense of shoemaking or in common understanding, these sandals have neither welt nor uppers. They do not come to the ankle. There is no line of demarcation between the sole and upper because there is no upper. It taxes credulity to believe that a shoe, in the sense that that word is used in the paragraph, can be said to have an upper unless it is permanently fastened to the sole. No dictionary definition of the word shoe can be found including, nor does the common understanding of the word include, an article of footwear with no upper of any kind permanently attached to the sole, or a sole that is held to the foot only by thongs or strings not permanently attached thereto but removable at will.

Congress, in paragraph 1606 in the provision for leather cut into shoe uppers, vamps, and soles, has indicated that it deemed that shoes consisted, when finished, not only of soles but of vamps and uppers. If these thongs are uppers, any leather thong, string, or shoe string made for the purpose of holding sandals or shoes to the foot would be uppers within the meaning of paragraph 1606, a result which we do not think was intended.

We are of opinion that the judgment below should be affirmed.